IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>PLAINTIFF,<br><br>v.<br><br>$8,500.00 IN UNITED STATES CURRENCY,<br>DEFENDANT. | Civil Action No.<br><br>1:21-cv-03847-TWT |

**Plaintiff's Memorandum in Support of its Response in
Opposition to Claimant Brian Moore's Motion to Suppress**

NOW COMES, Plaintiff, the United States of America, by Ryan K. Buchanan, United States Attorney, and Radka T. Nations, Assistant United States Attorney for the Northern District of Georgia, and files its Memorandum in Support of its Response in Opposition to Claimant Brian Moore's Motion to Suppress. (Doc. 22). For the reasons set forth below, this Court should deny Claimant's motion to suppress.

I. **Factual Background**

On or about March 26, 2021, agents with the Drug Enforcement Administration ("DEA") conducted random interdiction stops at the Hartsfield-Jackson Atlanta International Airport, located at 6000 North Terminal Parkway, Atlanta, Georgia on a Spirit Airline flight departing from Atlanta, Georgia to Los

1

Angeles, California. [Doc. 1, ¶ 10]. While DEA agents were in the process of conducting stops with two individuals, agents noticed a third individual sitting in the waiting area who was nervously looking around and paying close attention to what the DEA agents were doing. [Doc. 1, ¶ 11]. The agents noticed that this individual, later identified as Brian Keith Moore, Jr. ("the Claimant"), had more than one cell phone, which is common for individuals involved in illegal narcotics distribution. [Doc. 1, ¶ 12]. The agents noticed that the Claimant hastily picked up his belongings and started to leave the gate area. [Doc. 1, ¶ 13]. As the Claimant was leaving the gate area, agents approached him, identified themselves as federal agents, and informed him that they were conducting random interdiction stops at the airport. [Doc. 1, ¶ 14].

The agents further informed the Claimant that they were looking for illegal narcotics, to which the Claimant denied having any narcotics with him or on his person. [Doc. 1, ¶ 15]. After the agents asked the Claimant if he was carrying large sums of money, the Claimant replied affirmatively. [Doc. 1, ¶ 16]. When asked how much money he was carrying, the Claimant stated that he was carrying less than $10,000, he had saved these money, and he was a musician. [Doc. 1, ¶ 17]. The Claimant refused, however, to provide additional details. [Doc. 1, ¶ 17].

The agents asked the Claimant for a copy of his boarding pass and driver's

license. [Doc. 1, ¶ 18]. The Claimant inquired about the purpose of requesting the documents, and the DEA agents explained that they would conduct records' check while the Claimant spoke to another agent. [Doc. 1, ¶ 19]. When asked if he had a criminal history, the Claimant denied having any criminal history. [Doc. 1, ¶ 20]. The agents asked the Claimant for his consent to search his bags, to which the Claimant replied that he preferred that they do not search his bags. [Doc. 1, ¶ 21]. The agents informed Claimant that he had the right to refuse, and the Claimant exercised that right and refused to consent to the search. [Doc. 1, ¶ 22].

DEA Special Agent Erika Williams ("SA Williams") conducted the Claimant's criminal history check and discovered that he was arrested in June of 2011 for felony theft charges, but his case was dismissed. [Doc. 1, ¶ 23]. She further discovered that the Claimant was arrested in April of 2019 for possession of marijuana, less than one ounce. He was sentenced to twelve months' probation and completed his pretrial diversion for that arrest. [Doc. 1, ¶ 23]. After Agent Williams asked the Claimant why he lied about his criminal history, the Claimant again denied having a criminal history. [Doc. 1, ¶ 24]. When asked, the Claimant provided SA Williams with the last four digits of his social security number, which SA Williams confirmed. [Doc. 1, ¶¶ 24-25]. The Claimant then changed his statement, claiming that he had forgotten about the criminal history and that he

did not think that it was important. [Doc. 1, ¶ 25].

The agents asked the Claimant about the purpose of his travel to Los Angeles, and the Claimant stated that he was going to visit his brother and shoot a music video. [Doc. 1, ¶ 26]. The Claimant initially stated, among other things, that his brother, whose name is identical to the Claimant's, was 27 years old. Agent asked the Claimant about his brother's date of birth. This time, the Claimant claimed that his brother was approximately 32 years old. [Doc. 1, ¶¶ 27-29]. The Claimant was also unable to tell the agents in what part of Los Angeles his brother resided. [Doc. 1, ¶ 30].

SA Williams advised the Claimant that his black duffel bag would be seized, and a search warrant would be requested. [Doc. 1, ¶ 31]. The Claimant then asked SA Williams if she could promise to let him take his bag and its contents on the plane if he allowed her to search the bag. [Doc. 1, ¶ 32]. SA Williams informed the Claimant that she could not make any promises because the decision would be made based on what was found in the bag. [Doc. 1, ¶ 33]. The Claimant told the agents that he had money in the bag which were bundled. The Claimant then stated that he wanted to give the agents permission to search his bag. [Doc. 1, ¶ 34]. The Claimant also signed the "DEA Form 88," which is a "Consent to Search" form. [Doc. 1, ¶ 35].

During the search of the Claimant's black duffel bag, the agents located a red Adidas fanny pack, which contained $8,500.00 United States currency (the "Defendant Currency") wrapped in black hair ties. [Doc. 1, ¶¶1, 36]. Bundling money in rubber bands is a common way used by drug dealers to transport large sums of currency. [Doc. 1, ¶ 36]. The Claimants told the agents that his rapper name was "Black Joker- Hitman Kid" and that the purpose of his trip to Los Angeles was to record a song. [Doc. 1, ¶ 37]. However, an online search of Moore's rapper name and music videos did not reveal any results. [Doc. 1, ¶ 38]. The Claimant alleged that the money was to be used for various purposes, including shopping, and funding a music video. [Doc. 1, ¶ 39].

During the encounter, the Claimant initially stated that he did not use online banking. [Doc. 1, ¶ 40]. However, the agents later observed the Claimant access an online bank account, as he showed them a withdrawal transaction. [Doc. 1, ¶ 43]. When agents inquired into the Claimant's earlier statement that he did not use online banking, the Claimant alleged that the account belonged to his grandmother. [Doc. 1, ¶ 44]. Despite Claimant's allegation, SA Williams saw that the welcome screen of the online bank account read "Welcome Brian." [Doc. 1, ¶ 45]. Subsequently, after the agents asked the Claimant if he could show that the online bank account belonged to his grandmother, he went through the account

settings, but was unable to show the bank's association with his grandmother's name. [Doc. 1, ¶ 46]. The Claimant stated that he received approximately $1,800 per month for his previous Army service but refused to provide additional details about his military service. [Doc. 1, ¶ 41]. Further, the Claimant initially stated that his mother and grandmother provided him some of the money for the music video, but later claimed that his aunt, not his mother, gave him the money. [Doc. 1, ¶ 42].

Thereafter, the agents placed the Defendant Currency in a self-sealing evidence envelope ("SSEE"). [Doc. 1, ¶ 47]. The Claimant verified the number of the bag, then signed the envelope and the DEA Form 12 receipt. [Doc. 1, ¶ 47]. The Claimant then stated that he planned on boarding his flight, and the agents informed him he was free to go. [Doc. 1, ¶ 48].

Before leaving, the Claimant asked the agents if he could take a picture of their identification, but they informed him that they were not allowed to let him take pictures of their government Personal Identification Verification ("PIV") cards or credentials. [Doc. 1, ¶ 49]. Soon thereafter, agents brough the sealed envelope to K-9 Bane, who gave a positive alert to the odor of narcotics on the SSEE. [Doc. 1, ¶ 50]. Agents then transported the Defendant Currency, held in the SSEE, to the DEA Atlanta Field Division Office and eventually turned it over

to the United States Marshals Office. [Doc. 1, ¶ 51].

## II. Procedural History

On or around June 21, 2021, Moore filed a claim with the DEA, asserting that he is the owner of the Defendant Currency. [Doc. 1, ¶ 52]. Pursuant to 18 U.S.C. § 983(a)(3), the DEA then referred the matter for judicial forfeiture proceedings to the United States Attorney's Office for the Northern District of Georgia. On or about September 17, 2021, the United States filed its Verified Complaint for Forfeiture against the Defendant Currency on the grounds that the Defendant Currency was subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C). On or about May 24, 2022, the Claimant filed his Motion to Suppress, seeking the suppression of his identity, his statements to the agents, and any evidence gathered by the DEA agents, to which the United States now responds and opposes.

## III. Argument and Citation to Authority
### a. Claimant Was Not "Seized" Within the Meaning of the Fourth Amendment During His Initial Encounter with DEA Agents

It has long been recognized that not every encounter between individuals and law enforcement constitutes "seizures" that implicate the protections of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. $242,484.00*, 131 F. App'x 130, 133 (11th Cir. 2005); *United States v. Alvarez–Sanchez*, 774 F.2d 1036, 1040 (11th Cir.1985)). "The crucial inquiry in deciding whether a given

encounter implicates the Fourth Amendment is determining whether, considering all the circumstances, a reasonable person would have believed that [he] was not free to leave if [he] refused to answer an officer's questions. *$242,484.00*, 131 F. App'x at 133. A "seizure" has occurred "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . ." *Terry v. Ohio*, 392 U.S. at 19 n.16.

It is well established that the Fourth Amendment is not violated when law enforcement approaches an individual in a public place or asks whether that individual will answer questions. *United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1504 (9th Cir. 1988) (*citing Florida. v. Royer*, 460 U.S. 491, 497 (1983)). "Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification." *Florida. v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229 (1983), (*citing United States v. Mendenhall*, 446 U.S. 544, 555, 100 S. Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)).

Several factors can be considered in determining whether an encounter between a law enforcement officer and an individual constitutes a seizure, but the principal considerations are: "(1) the conduct of the police; (2) the person of the individual citizen; and (3) the physical surroundings of the encounter."

*United States v. Black*, 675 F.2d 129, 134 (7th Cir. 1982). Specifically in airport stops, factors such as "blocking a citizen's path or impeding his progress," "retaining his ticket or identification," or making statements that "the individual is the focus of an investigation or that a truly innocent person would cooperate with police…" may indicate a seizure has occurred. *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984).

     In the instant case, the agents only approached the Claimant after observing that he was "nervously looking around and paying close attention to what the DEA agents were doing," then observing that the Claimant was in possession of more than one cell phone and attempted to leave the gate area after "hastily" gathering his possessions. The law enforcement officers identified themselves as federal agents, informed the Claimant of their duties at the airport, and asked him questions related to his travel and possessions. *See United States v. Jensen*, 689 F.2d 1361, 1363-64 (11th Cir. 1982) (law enforcement officers' request for defendant's identification and their inquiry into whether defendant was in possession of drugs did not constitute a seizure). The agents made no signs of force, show the Claimant their weapons, block the Claimant's path, or restrain or impede his movements in any way. *See United States v. Erwin*, 803 F.2d 1505, 1508 (9th Cir. 1986) (no seizure where the stop occurred in a public

area and no show of force was made). The Claimant neither asked whether he was free to go nor did he indicate he wished to leave during the initial encounter, and the agents said nothing on the point – they simply asked their routine questions and the Claimant answered them. In short, the agents' conduct during the initial encounter did not convey that the Claimant was not free to go nor did the Claimant's conduct indicate a desire to leave the encounter at that time. Considering the foregoing analysis and factors, the Claimant's initial encounter with the agents did not constitute a Fourth Amendment "seizure."

  **b. The Agents' Continued Questioning of Claimant Was Supported by Reasonable Suspicion**

*Terry* and subsequent cases have shown that officers may briefly detain a person for investigative purposes on less than probable cause if they have a reasonable suspicion that an individual is engaged in criminal activity. *Terry*, 392 U.S. at 20-27. That suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." *Terry*, 392 U.S. at 21 (footnote omitted).

  Here, even we assume for the sake of argument that the remainder of the encounter constitutes a Fourth Amendment "seizure," the agents had reasonable suspicion based on "specific and articulable facts" that warranted further inquiry into the Claimant's travel. First, during the encounter, the Claimant initially

refused to provide additional details regarding the United States currency he was carrying.  Second, the Claimant attempted to deceive law enforcement by stating on more than one occasion that he did not have a criminal history.  Third, the Claimant claimed that he was a rapper and was traveling to Los Angeles to record a song; however, an online search of the Claimant's alleged rapper name and music video provided no results.  Fourth, Claimant initially claimed that he did not use online banking, but later accessed an online bank account with a welcome screen that read "Welcome Brian," the Claimant's first name.

In determining whether the agents had a reasonable suspicion that the claimant was engaged in criminal activity, it must be emphasized that the facts observed by the agents must be considered together and in context, rather than individually.  *Terry*, 392 U.S. at 21.  While each individual fact observed by the agents during their encounter with the Claimant may seem unremarkable, when taken together, they provided a reasonable suspicion that the Claimant was engaged in criminal activity and warranted the agents' continued questioning. We submit that the encounter between the agents and the Claimant in this case was reasonable. The agents were aware of "specific and articulable facts" that enabled them reasonably to suspect the Claimant within the meaning of *Terry*

and, thus, the Claimant's Fourth Amendment rights were not violated because of the agents' continued questioning.

### c. The Claimant's Encounter with DEA Agents Did Not Constitute a Prolonged Detention

The record in this case does not support a finding that the DEA agents' encounter with the Claimant was of such a duration that it violated the Claimant's Fourth Amendment rights. This Circuit has established that "[r]igid time limitations and bright line rules are generally inappropriate." *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001). The Court in *Purcell* recognized that "[u]nder some circumstances a criminal record request might lengthen a traffic stop beyond what is reasonable in a particular case." *Purcell*, 236 F.3d at 1279. Further, stops of varying and extensive lengths have been found to be reasonable. *See United States v. Purcell*, 236 F.3d at 1277-1278 (finding that fourteen-minute traffic stop was not unreasonable); *see also United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (fifty-minute traffic stop did not violate Fourth Amendment); *United States v. Shareef*, 100 F.3d 1491, 1501-1502 (10th Cir. 1996) (the driver's thirty-minute detention, "given the totality of the circumstances" was reasonable).

Here, the record supports that the Claimant's criminal history check was conducted contemporaneously with the encounter, and the agents' continued

12

questioning was the result of Claimant's own deceit regarding his criminal history, the discrepancy between the Claimant's alleged employment as a rapper and the lack of verifiable results online, and the Claimant's statements regarding his use of online banking.  The Claimant was not made to wait until a narcotics-sniffing dog arrived at the airport, and the Claimant makes no allegation in his Motion that he missed his flight because of the encounter.  The Defendant Currency was seized and, once the Claimant informed the agents that he intended to board his flight, the agents made it clear he was free to go.  There is insufficient evidence in the record as to the exact duration of the encounter or that its duration was of such an unreasonable time that it was violative of the Fourth Amendment.  As such, the Claimant's Motion to Suppress on the ground that the duration of the encounter was unreasonable should be denied.

    **d. Claimant Gave the DEA Valid Consent to the Search of his Duffle Bag**

The Fourth Amendment requires "the government to respect "[t]he right of the people to be secure in their person . . . and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Warrantless searches are generally considered "per se unreasonable" unless an established exception applies.  *United States v. Henry*, 615 F.2d 1223, 1230 (9th Cir. 1980) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  It is well-established that an

individual's valid consent to the search constitutes an exception. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Johnson*, 608 F. App'x 764, 767 (11th Cir. 2015); *Schneckloth*, 412 U.S. at 219; *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989); *Henry*, 615 F.3d at 1230.

In this case, the Claimant voluntarily consented, verbally and in writing, to the search of his black duffel bag. "Whether consent is voluntary is a fact question determined according to the totality of the circumstances." *Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1326 (11th Cir. 2008) (*citing Schneckloth*, 412 U.S. at 226–27; *United States v. Blake*, 888 F.2d 795, 798 (11th Cir.1989)).

To ascertain the voluntariness of an individual's consent, several factors must be considered, including "whether the person is in custody, the existence of coercion, the person's awareness of his right to refuse consent, the person's education and intelligence, and whether the person believes incriminating evidence will be found." *Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1326 (11th Cir. 2008), *citing Blake*, 888 F.2d at 798. Further, in analyzing whether Claimant's consent was voluntary, the facts of the case must be scrutinized, and a balance found between the Claimant's "right to be free from coercive conduct and the legitimate need of the government to conduct lawful searches." *Garcia*, 890 F.2d at 360 (*citing Schneckloth*, 412 U.S. at 227).

To find coerced consent, there must be evidence that the agents' conduct undermined the Claimant's ability to make a reasoned judgment. *See United States v. Hall*, 565 F.2d 917, 921 (5th Cir. 1978). Voluntariness has been found in this circuit where the conditions surrounding the individual's consent were far more coercive than the facts in this case, or even Claimant's allegations. For example, the Eleventh Circuit Court of Appeals found in *United States v. Long* that the defendant's consent to search his backyard for counterfeit currency to be voluntary where the officers' stated that, if the defendant refused to consent, they would return and "dig the place up." *United States v. Long*, 866 F.2d 402, 404-405 (11th Cir. 1989) (finding that "[e]ven if the officers stated that they could come back and 'dig the place up,' such a statement does not amount to coercion."). In another case, *United States v. Espinosa-Orlando*, the Court determined that the defendant's consent to a search was voluntary, even though, at the time defendant gave his consent, the defendant was lying on the ground with three police officers nearby and one standing apart with his weapon unholstered and pointed away from the defendant. *United States v. Espinosa-Orlando*, 704 F.2d 507, 512-513 (11th Cir. 1983).

Here, coercion did not occur. Claimant was neither detained nor taken into custody by the DEA agents who approached him. Claimant was not

15

handcuffed or physically restrained in any way. The agents neither displayed any weapons nor physically touched the Claimant. At no point during the encounter was Claimant threatened, intimidated, or otherwise compelled to give his consent to a search of his travel bag. Moreover, the Claimant knew he had right to refuse a search of his bag as he had exercised that right early in the encounter. *See United States v. Mendenhall*, 446 U.S. 544, 558-59, 100 S. Ct. 1879 (1980) ("Although the Constitution does not require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search,' ... such knowledge was highly relevant to the determination that there had been consent.") (citations omitted). The agents' statements in this case regarding a search warrant are distinguishable from the facts in *United States v. Momodu*, cited by the Claimant, in which the Court stated that the officer did not tell the defendant that "he would *apply* for a warrant or *attempt* to obtain a warrant." *United States v. Momodu*, 909 F. Supp. 1571, 1579-1580. Instead, in that case, the Court found that the officer "implied that he had authority to search, and that a warrant would issue automatically." *Momodu*, 909 F. Supp. 1571, 1580. In this case, the agents did exactly what the officer in *Momodu* failed to do - informed that Claimant's duffle bag would be seized, and that they would *request* a search warrant. Thus, no similar threat as that in *Momodu* was issued in this case.

Further, after attempting, and failing, to elicit a promise from the agents that he could maintain possession of his bag and its contents if he consented to a search, Claimant verbally consented to the agents searching his bag. Claimant then freely and voluntarily signed a DEA Form-88 Consent to Search form. Under the totality of the circumstances, the conditions that existed at the time of the Claimant's consent to search his bag do not demonstrate that his consent was involuntary or coerced. Accordingly, the United States respectfully requests that this Court deny the Claimant's motion to suppress on this ground.

### e. The Search and Seizure of Claimant's Bag and Defendant Currency Was Supported by Probable Cause

Here, the agents had probable cause to search Claimant's black duffel bag and seize the currency inside. "Probable cause to search exists where the facts warrant a reasonably cautious person to believe that the 'search will uncover evidence of a crime.'" *United States v. Armstrong*, 722 F.2d 681, 686 (11th Cir. 1984) (*citing United States v. Rojas*, 671 F.2d 159, 165 (5th Cir. 1982)). Here, the agents' observations of the Claimant of Claimant's nervous behavior, the Claimant's attempt to leave the gate area after watching the DEA agents conducting random stops, the Claimant's denial of a criminal history, the Claimant's 2019 arrest for possession of marijuana, and the Claimant's contradicting statements, as well as the subsequent positive dog-sniff alert for the

odor of narcotics on the Defendant Currency, all provided sufficient probable cause to both search and then seize Claimant's bag and the Defendant Currency. Therefore, the United States respectfully requests that this Court deny the Claimant's Motion to Suppress on this gound.

## IV. Conclusion

For the foregoing reasons, the United States respectfully requests that this Court deny the Claimant's Motion to Suppress.

Respectfully submitted,

**RYAN K. BUCHANAN**
  *United States Attorney*

/s/ Radka T. Nations
**RADKA T. NATIONS**
  *Assistant United States Attorney*
Georgia Bar No. 618248
600 U.S. Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA 30303
Telephone: (404) 581-6000