IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

PLAINTIFF,

v.

$8,500.00 IN UNITED STATES
CURRENCY,

DEFENDANT.

Civil Action No.

1:21-cv-03847-TWT

## MEMORANDUM OF LAW IN SUPPORT OF CLAIMANT'S MOTION FOR SUMMARY JUDGMENT

Claimant, BRIAN KEITH MOORE, JR., by and through his undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7 and 56 of the Local Rules for the Northern District of Georgia, and hereby files this Memorandum of Law in Support of Claimant's Motion for Summary Judgment.

### INTRODUCTION

This is a forfeiture action regarding $8,500.00 United States Currency pursuant under the Civil Asset Forfeiture Reform Act (CAFRA). Claimant Brian Moore is the lawful owner of the currency at issue and that such currency was

1

illegally and wrongfully seized from Mr. Moore by agents of the Plaintiff United States of America. This Motion for Summary Judgment is filed within 30 days of the close of discovery on August 4, 2022.

Claimant is entitled to summary judgment on Plaintiff's forfeiture claims as, based on the undisputed facts, as a matter of law Plaintiff cannot show probable cause that the currency at issue is connected to or derived from the illegal distribution of a controlled substance or any other illegal action.

### CLAIMANT'S STATEMENT OF UNDISPTED MATERIAL FACTS[1]

1. On March 26, 2021, Claimant Brian Moore was at Hartsfield-Jackson International Airport for the purpose of flying from Atlanta to Los Angeles. (Moore Aff. ¶ 3).[2]

2. After Mr. Moore passed through the security checkpoints with his carry-on luggage, he sat and waited for his flight in the gate area. (Moore Aff. ¶ 4).

3. For reasons unbeknownst to Mr. Moore, he was approached by several DEA agents who began interrogating him as to where he was going and

---

[1] An identical Claimant's Statement of Undisputed Material Facts is also filed as a separate exhibit, Exhibit 1, to this Memorandum as required by Local Rule 56.1(B)(1).
[2] The referenced Affidavit of Claimant Brian Moore is attached hereto as Exhibit 2.

the contents of his luggage. (Moore Aff. ¶ 5).

4. Because the three agents were surrounding him, Mr. Moore did not believe that he was free to leave and instead believed he was being detained by the agents. (Moore Aff. ¶ 5).

5. It was clear to Mr. Moore that if he tried to leave, the agents might consider it to be obstruction of their investigation or resisting arrest and that he was not free to leave with the property he needed for the trip. (Moore Aff. ¶ 5).

6. The DEA agents interrogated Mr. Moore about whether his bag contained any drugs or other illegal contraband. Mr. Moore advised the agents that there was nothing illegal in his bag. (Moore Aff. ¶6).

7. The DEA agents further interrogated Mr. Moore about his criminal history, why he was traveling, and what he was going to do when in Los Angeles. The agents' interrogation and questions were made in very aggressive and accusatory tones. (Moore Aff. ¶ 7).

8. The agents demanded that Mr. Moore tell them whether he was carrying any currency in his bag. Mr. Moore explained to them that he was carrying currency but it was less than $10,000.00 in currency. (Moore Aff. ¶¶8-9).

9.  Mr. Moore's understanding at the time was that persons are allowed to travel with less than $10,000.00 in cash. (Moore Aff. ¶¶8-9).

10. The DEA agents continued to repeatedly demand that Mr. Moore tell them exactly how much money he had in his luggage. (Moore Aff. ¶10).

11. The DEA agents then advised Mr. Moore that they wanted to search his bag which Mr. Moore politely declined. (Moore Aff. ¶11).

12. At the time, however, Mr. Moore did not believe he had a choice but to stand by while they searched. Mr. Moore was scared that the agents would be mad if he refused or feared that the agents would arrest him for interfering with their investigation. (Moore Aff. ¶11).

13. The agents also told Mr. Moore that they were going to seize his bag and obtain a search warrant if he did not consent to a search which would definitely cause a long delay and cause him to miss his flight. (Moore Aff. ¶ 12).

14. Since the DEA agents already said they were seizing his bag regardless of what he said, Mr. Moore stood by while they searched the bag. Mr. Moore did not believe he was free to just leave and was unsure how he could travel without my personal property. As the DEA agents continued to

threaten him with further delay, Mr. Moore eventually acquiesced to their apparent authority to seize his bag and search it. (Moore Aff. ¶ 13).

15. While he did sign a form the agents put in front of him stating that he consented to a search of his bag, such a signature was coerced and Mr. Moore did not sign the consent freely and voluntarily. Indeed, Mr. Moore only signed the form because he felt like he had no other choice and that he would not be allowed to leave and take his flight with his luggage if he did not sign. (Moore Aff. ¶¶14-15).

16. Subsequently, the DEA agents searched Mr. Moore's bag, went through all of his property, and removed $8,500.00 in currency.  (Moore Aff. ¶ 16).

17. Upon further interrogation, Mr. Moore advised the agents that he had recently withdrawn the majority of the cash from a bank account he maintained with his grandmother. In response to their repeated questions, Mr. Moore had to explain several times how his grandmother obtained $10,000.00 on his behalf after selling his deceased grandfather's vehicle to Carmax. (Moore Aff. ¶ 17).

18. Mr. Moore further explained that it was his grandfather's wish that the money received from the sale of his vehicle be given to Mr. Moore. (Moore

Aff. ¶¶ 18-20).

19. The $10,000.00 check from Carmax was deposited into a joint account held by Mr. Moore and his grandmother, Jacqueline R. Butler, on Mr. Moore's behalf. (Moore Aff. ¶¶ 18-20).

20. Mr. Moore further explained to the agents that he withdrew approximately $7,500.00 from the joint account in anticipation of a future trip to Los Angeles, where among other things, he intended to record a music video and do a photo shoot. (Moore Aff. ¶ 21).

21. Mr. Moore advised the agents at the airport that the money would be used primarily to shoot a music video. Mr. Moore even advised the agents of the rap name he records under, which is "Black Joker-Hitman Kid." (Moore Aff. ¶ 22).

22. The agents reacted by insinuating that everything Mr. Moore said was a lie and that he was a drug dealer. (Moore Aff. ¶ 23).

23. The $8,500.00 in currency that was taken from Mr. Moore by the DEA agents was money he received from a legitimate source, it was intended for a legitimate purpose, and was not obtained through any illegal activity as he explained to the agents several times. (Moore Aff. ¶¶ 17-20).

24. Mr. Moore was not arrested or charged with any crime regarding the money taken from him by the DEA agents nor his travels to Los Angeles on or about March 26, 2021. (Moore Aff. ¶ 26).

## ARGUMENT

As discussed below, Claimant is entitled to summary judgment on Plaintiff's forfeiture claims as Plaintiff cannot establish that there is any evidence, much less probable cause, that the currency taken from Claimant constitutes or was derived from proceeds of illegal distribution of a controlled substance.

Plaintiff has initiated this forfeiture case pursuant to 21 U.S.C. Section 881(a)(6) and 18 U.S.C. Section 981(a)(1)(C). Pursuant to 21 U.S.C. Section 881(a)(6), "the government bears the initial burden of demonstrating probable cause of 'a substantial connection between the property and the underlying criminal activity.'" *United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 848 (6th Cir. 1994), *quoting United States v. $53,082.00 in U.S. Currency,* 985 F.2d 245, 250 (6th Cir. 1993) (further citations omitted). The government is therefore required to establish "a reasonable ground for belief, supported by more than mere suspicion, that there is a substantial connection between the seized money and an illegal drug transaction." *United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 848 (6th Cir. 1994),

*quoting United States v.$67,220.00 in U.S. Currency,* 957 F.2d 280, 284 (6th Cir. 1992).

In *United States v. $5,000 in U.S. Currency*, 40 F.3d 846 (6th Cir. 1994), the Court found that the government had failed to meet its burden in an airport seizure case like the instant case. In *$5,000 in U.S. Currency*, agents seized money after receiving an anonymous tip regarding drug transactions. In that case, the agents found $5,000 in currency in bundles, a drug dog alerted to the currency, there was a claim that the claimant had been evasive and lied about the purpose of his trip, and one of the claimant's had a previous drug conviction from several years earlier. *United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 847-849 (6th Cir. 1994). In finding that the government had not shown probable cause to seize the currency, the court noted that the drug dog alert as to the currency was of limited value as there is an indication and some evidence that narcotics residue may be found on up to 96% of United States Currency. *See id. at* 849-850. Moreover, the court found that evasive statements about the trip did not form the basis of probable cause of criminal activity and at best provided an "inchoate and unparticularized suspicion." *Id.* at 850. Furthermore, the court also noted that currency is not necessarily contraband and that carrying a large amount of cash may lead to a suspicion of drug activity, sums of up to $15,000 to $20,000 "is hardly

enough cash, standing alone, to justify more than a suspicion of illegal activity."
*United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 849-850 (6th Cir. 1994), *quoting*
*United States v. $191,910.00 in U.S. Currency*, 16 F.3d1051, 1072 (6th Cir. 1994); *see also*
*United States v. Baro*, 15 F.3d 563, 568 (6th Cir.1994). Finally, evidence of a drug
conviction from years earlier could not form the basis for probable cause as "a
man's debt to society cannot be of infinite duration." *United States v. $5,000 in U.S.*
*Currency*, 40 F.3d at 850.

With all of these issues in mind, the court in *$5,000 in U.S. Currency* held that
the government failed to establish probable cause to support the forfeiture and a
much more substantial connection between the money and drug activity would
have to be established to support a forfeiture. *Id.* at 850; *see also United States v.*
*$22,800.00 in U.S. Currency*, 2017 WL 10574356 (C.D. Cal. 2017) (Similar case where
a canine alert to a large amount of currency and inconsistent statements could not
form the basis for probable cause to support a forfeiture).  In the instant case, far
less than the evidence available in *$5,000 in U.S. Currency* is available though,
based on its complaint, the government in this case may attempt to use some of
same insufficient arguments to justify the seizure of Mr. Moore's money. These
arguments must also fail here.

What is more is that Mr. Moore provided the agents with uncontroverted evidence of where the currency in this case came from and that such sources were legitimate. Mr. Moore advised the agents that he had recently withdrawn the majority of the cash from a bank account he maintained with his grandmother. In response to their repeated questions, Mr. Moore had to explain several times how his grandmother obtained $10,000.00 on his behalf after selling his deceased grandfather's vehicle to Carmax. (Moore Aff. ¶ 17). Mr. Moore further explained that it was his grandfather's wish that the money received from the sale of his vehicle be given to Mr. Moore. (Moore Aff. ¶¶ 18-20). The $10,000.00 check from Carmax was deposited into a joint account held by Mr. Moore and his grandmother, Jacqueline R. Butler, on Mr. Moore's behalf. (Moore Aff. ¶¶ 18-20).

Mr. Moore further explained to the agents that he withdrew approximately $7,500.00 from the joint account in anticipation of a future trip to Los Angeles, where among other things, he intended to record a music video and do a photo shoot. (Moore Aff. ¶ 21). Mr. Moore advised the agents at the airport that the money would be used primarily to shoot a music video. Mr. Moore even advised the agents of the rap name he records under, which is "Black Joker-Hitman Kid." (Moore Aff. ¶ 22). Mr. Moore was not arrested or charged with any crime

regarding the money taken from him by the DEA agents nor his travels to Los

Angeles on or about March 26, 2021. (Moore Aff. ¶ 26).

Simply put, the $8,500.00 in currency that was taken from Mr. Moore by the

DEA agents was money he received from a legitimate source, it was intended for a

legitimate purpose, and was not obtained through any illegal activity as he

explained to the agents several times. (Moore Aff. ¶¶ 17-20). There is no

competent, substantial evidence linking Mr. Moore's currency to any illegal

activity. To allow the government to proceed with a forfeiture in this case would be

akin to allowing the government to confiscate any amount of cash from a person

simply because of their race or because the agents do not like the way a person

looks.

## CONCLUSION

Claimant is entitled to summary judgment on Plaintiff's forfeiture claims as

Plaintiff cannot establish that there is any evidence, much less probable cause, that

the currency taken from Claimant constitutes or was derived from proceeds of

illegal distribution of a controlled substance.

WHEREFORE, based on the motion set forth and Claimant's Memorandum

of Law in Support of Motion for Summary Judgment and attached Exhibits,

11

Claimant respectfully requests that this Court grant his motion for summary judgment.  Plaintiff requests that this Court order Plaintiff to return the currency at issue to the Claimant, with interest, and that Claimant be awarded attorneys' fees to be determined after subsequent application to this Court.

Respectfully submitted, this 2nd day of September, 2022.

By:     /s/ Jason D. Sammis
        Jason D. Sammis
        Georgia Bar No. 623532
        Leslie M. Sammis
        Georgia Bar No. 623535
        Sammis Law Firm, P.A.
        1005 N. Marion St.
        Tampa, FL 33602
        Email: info@sammislawfirm.com
        Telephone: 813-250-0500

Exhibit "1"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| PLAINTIFF, | Civil Action No. |
| *v.* | 1:21-cv-03847-TWT |
| $8,500.00 IN UNITED STATES CURRENCY, | |
| DEFENDANT. | |

**CLAIMANT'S STATEMENT OF UNDISPTED MATERIAL FACTS**

1. On March 26, 2021, Claimant Brian Moore was at Hartsfield-Jackson International Airport for the purpose of flying from Atlanta to Los Angeles. (Moore Aff. ¶ 3).

2. After Mr. Moore passed through the security checkpoints with his carry-on luggage, he sat and waited for his flight in the gate area. (Moore Aff. ¶ 4).

3. For reasons unbeknownst to Mr. Moore, he was approached by several DEA agents who began interrogating him as to where he was going and the contents of his luggage. (Moore Aff. ¶ 5).

1

4. Because the three agents were surrounding him, Mr. Moore did not believe that he was free to leave and instead believed he was being detained by the agents. (Moore Aff. ¶ 5).

5. It was clear to Mr. Moore that if he tried to leave, the agents might consider it to be obstruction of their investigation or resisting arrest and that he was not free to leave with the property he needed for the trip. (Moore Aff. ¶ 5).

6. The DEA agents interrogated Mr. Moore about whether his bag contained any drugs or other illegal contraband. Mr. Moore advised the agents that there was nothing illegal in his bag. (Moore Aff. ¶6).

7. The DEA agents further interrogated Mr. Moore about his criminal history, why he was traveling, and what he was going to do when in Los Angeles. The agents' interrogation and questions were made in very aggressive and accusatory tones. (Moore Aff. ¶ 7).

8. The agents demanded that Mr. Moore tell them whether he was carrying any currency in his bag. Mr. Moore explained to them that he was carrying currency but it was less than $10,000.00 in currency. (Moore Aff. ¶¶8-9).

9.  Mr. Moore's understanding at the time was that persons are allowed to travel with less than $10,000.00 in cash. (Moore Aff. ¶¶8-9).

10.  The DEA agents continued to repeatedly demand that Mr. Moore tell them exactly how much money he had in his luggage. (Moore Aff. ¶10).

11. The DEA agents then advised Mr. Moore that they wanted to search his bag which Mr. Moore politely declined. (Moore Aff. ¶11).

12. At the time, however, Mr. Moore did not believe he had a choice but to stand by while they searched. Mr. Moore was scared that the agents would be mad if he refused or feared that the agents would arrest him for interfering with their investigation. (Moore Aff. ¶11).

13. The agents also told Mr. Moore that they were going to seize his bag and obtain a search warrant if he did not consent to a search which would definitely cause a long delay and cause him to miss his flight. (Moore Aff. ¶ 12).

14. Since the DEA agents already said they were seizing his bag regardless of what he said, Mr. Moore stood by while they searched the bag. Mr. Moore did not believe he was free to just leave and was unsure how he could travel without my personal property. As the DEA agents

3

continued to threaten him with further delay, Mr. Moore eventually acquiesced to their apparent authority to seize his bag and search it. (Moore Aff. ¶ 13).

15. While he did sign a form the agents put in front of him stating that he consented to a search of his bag, such a signature was coerced and Mr. Moore did not sign the consent freely and voluntarily. Indeed, Mr. Moore only signed the form because he felt like he had no other choice and that he would not be allowed to leave and take his flight with his luggage if he did not sign. (Moore Aff. ¶¶14-15).

16. Subsequently, the DEA agents searched Mr. Moore's bag, went through all of his property, and removed $8,500.00 in currency.  (Moore Aff. ¶ 16).

17. Upon further interrogation, Mr. Moore advised the agents that he had recently withdrawn the majority of the cash from a bank account he maintained with his grandmother. In response to their repeated questions, Mr. Moore had to explain several times how his grandmother obtained $10,000.00 on his behalf after selling his deceased grandfather's vehicle to Carmax. (Moore Aff. ¶ 17).

18. Mr. Moore further explained that it was his grandfather's wish that the money received from the sale of his vehicle be given to Mr. Moore. (Moore Aff. ¶¶ 18-20).

19. The $10,000.00 check from Carmax was deposited into a joint account held by Mr. Moore and his grandmother, Jacqueline R. Butler, on Mr. Moore's behalf. (Moore Aff. ¶¶ 18-20).

20. Mr. Moore further explained to the agents that he withdrew approximately $7,500.00 from the joint account in anticipation of a future trip to Los Angeles, where among other things, he intended to record a music video and do a photo shoot. (Moore Aff. ¶ 21).

21. Mr. Moore advised the agents at the airport that the money would be used primarily to shoot a music video. Mr. Moore even advised the agents of the rap name he records under, which is "Black Joker-Hitman Kid." (Moore Aff. ¶ 22).

22. The agents reacted by insinuating that everything Mr. Moore said was a lie and that he was a drug dealer. (Moore Aff. ¶ 23).

23. The $8,500.00 in currency that was taken from Mr. Moore by the DEA agents was money he received from a legitimate source, it was intended

for a legitimate purpose, and was not obtained through any illegal activity as he explained to the agents several times. (Moore Aff. ¶¶ 17-20).

24. Mr. Moore was not arrested or charged with any crime regarding the money taken from him by the DEA agents nor his travels to Los Angeles on or about March 26, 2021. (Moore Aff. ¶ 26).

Exhibit "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| PLAINTIFF, | Civil Action No. |
| *v.* | 1:21-cv-03847-TWT |
| $8,500.00 IN UNITED STATES CURRENCY, | |
| DEFENDANT. | |

### **AFFIDAVIT OF CLAIMANT, BRIAN KEITH MOORE, JR.**

1. My name is Brian Keith Moore, Jr.

2. I am the Claimant in this matter.

3. On March 26, 2021, I was at Hartsfield-Jackson International Airport for the purpose of flying from Atlanta to Los Angeles.

4. After I passed through the security checkpoints with my carry-on luggage, I was sitting and waiting for my flight in the gate area.

5. For reasons unbeknownst to me, I was approached by several DEA agents who began interrogating me as to where I was going and the contents of my luggage. Because the three agents were surrounding me, I did not believe that I was free to leave. Instead, I knew that I was being detained by the agents. Although the agent eventually said that I could leave without my luggage or any receipt, it was clear to me that they intended to detain me, they had

1

accused me of a crime, and if I tried to leave, they might consider it to be obstruction of their investigation or resisting. Even if I tried to leave, I would not have my property which I needed for the trip.

6. The DEA agents began interrogating me about whether my bag contained any drugs or other illegal contraband. I advised the agents that there was nothing illegal in my bag.

7. The DEA agents began interrogating me about my criminal history, why I was traveling, and what I was going to do when in Los Angeles. I thought I had no choice but to answer their questions since the questions were being made in such an aggressive and accusatory tone while I was being surrounded.

8. The agents demanded that I tell them whether I was carrying any currency in my bag to which I replied that I did have money but that it was less than $10,000.

9. I explained to them that I was carrying less than $10,000.00 in currency because it appeared to me the agents thought I had done something wrong by having some larger amount of money. It was my understanding that I was allowed to travel with less than $10,000.00.

10. The DEA agents continued to demand that I tell them exactly how much money I had, and they continued to ask the same questions over and over.

2

11. When the agents said that they wanted to search my bag, I did not think I had a choice but to stand by while they searched. I was scared that they would be mad if I refused or that they would arrest me for interfering with their investigation since they suspected I had drugs on me or had engaged in some other illegal conduct even though I knew that was not true.

12. The agents also told me they were going to seize my bag and obtain a search warrant if I did not consent to a search which would definitely cause a long delay, cause me to miss my flight, and might have required me to travel to some other location with them.

13. Since they already said they were seizing my bag without a warrant regardless of what I said, I decided to just stand by while they searched the bag. Because I did not believe I was free to just leave, I was unsure how I could travel without my personal property, and they were threatening to further delay me, I acquiesced to their apparent authority to seize my bag and search it.

14. I did not freely and voluntarily consent to a search of my luggage by the agents.

15. I do remember signing a form the agents put in front of me stating that I consented to a search of my bag but I did not sign this freely and voluntarily. I only signed the form because I felt like I had no other choice and that I would not be allowed to leave and take my flight with my luggage if I did not sign.

16. Subsequently, the agents searched my bag, went through all of my property, and removed $8,500.00 in currency.

17. I advised the agents that I had recently withdrawn the majority of the cash from a bank account I maintained with my grandmother.

18. After repeated questioning, I had to explain several times how my grandmother obtained $10,000.00 on my behalf after selling my deceased grandfather's vehicle to Carmax.

19. It was my grandfather's wish that the money received from the sale of his vehicle be given to me.

20. The $10,000.00 check from Carmax was deposited into a joint account held by me and my grandmother, Jacqueline R. Butler, on my behalf.

21. In February of 2021, I withdrew approximately $7,500.00 from the joint account in anticipation for a future trip to Los Angeles, where among other things, I intended to record a music video and do a photo shoot.

22. I advised the agents at the airport that the money would be used primarily to shoot a music video. I even advised them of my rap name that I record under, which is "Black Joker-Hitman Kid". My e-mail handle is Hittman Kidd da real black joker.

23. The agents reacted by insinuating that everything I said was a lie and that I was a drug dealer.

4

24. The $8,500.00 in currency that was taken from me by the DEA agents was money I received from a legitimate source, it was intended for a legitimate purpose, and was not obtained through any illegal activity as I explained to the agents several times.

25. I was not traveling to Los Angeles on March 26, 2021, for any illegal purpose. I was going to shoot a music video (with my half-brother helping to film and direct), do a photo shoot and shop.

26. I was not arrested or charged with any crime regarding the money taken from me by the DEA agents nor my travels to Los Angeles on or about March 26, 2021.

I do swear that the above is true and correct of the best of my knowledge and belief.

Brian Moore Jr
PRINT NAME

SIGNATURE

05-10-2022
DATED

STATE OF Georgia
COUNTY OF Bibb

Sworn to or affirmed and signed before me on 10 May 2022 by Brian Moore, who is _____ personally known to me or who produced Driver License, as identification.

Keyonna Jordan
NOTARY PUBLIC or DEPUTY CLERK

Keyonna Jordan
[Print, type, or stamp commissioned name of notary or deputy clerk.]

*(Notary seal: KEYONNA M JORDAN, MY COMMISSION EXPIRES APRIL 12 2026, BIBB COUNTY, GA., NOTARY PUBLIC)*

5